# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

| | |
|---|---|
| In re<br><br>**PAYTON CONSTRUCTION CORPORATION,**<br><br>　　　　　　　　**Debtor**<br>———————————————<br><br>**CRAIG JALBERT, LIQUIDATING TRUST ADMINISTRATOR,**<br><br>　　　　　　　　**Plaintiff**<br><br>v.<br><br>**ZURICH AMERICAN INSURANCE COMPANY,**<br><br>　　　　　　　　**Defendant** | **Chapter 11**<br>**Case No. 07-11522-HB**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 08-1173** |

## MEMORANDUM OF DECISION ON
## MOTION OF ZURICH AMERICAN INSURANCE COMPANY
## TO STAY OR DISMISS ADVERSARY PROCEEDING AND COMPEL ARBITRATION

By the motion before the court, Zurich American Insurance Company ("Zurich"),

as an administrative claimant in the bankruptcy case of Payton Construction Company

and the defendant in counterclaims asserted in the above-captioned adversary

proceeding, seeks (i) an order compelling arbitration of its administrative claim and of

the counterclaims asserted by the plaintiff-in-counterclaim, (ii) if the court compels

arbitration as to some but not all counts of the complaint, a stay pending arbitration of

the counts not being arbitrated, and (iii) if the court declines to compel arbitration of

Count V of the plaintiff's counterclaim, which count seeks to avoid an alleged fraudulent

transfer, dismissal of that count for failure to state a claim on which relief can be

granted.  Craig Jalbert, as the Liquidating Trust Administrator under the confirmed

liquidating plan in this case, opposes the motion.  For the reasons stated below, the

court will deny the motions to compel arbitration and to dismiss.


**I.      FACTS AND TRAVEL OF THE CASE**

Payton Construction Corporation ("Payton" or "the Debtor"), a general contractor,

filed a petition for relief under chapter 11 of the Bankruptcy Code on March 16, 2007.

Payton remained a debtor in possession until June 11, 2008, when the Court confirmed

a liquidating plan in the case; the plan became effective on July 3, 2008.  Under the

plan, a liquidating trust (the "Liquidating Trust") was established and Craig R. Jalbert

was appointed its Trust Administrator ("Jalbert").  Under the terms of the plan and the

Liquidating Trust, all assets of the Debtor's bankruptcy estate vested in the Liquidating

Trust, and the Trust Administrator was empowered to administer those assets, including

by prosecution of causes of action belonging to the estate, to object to claims, and to

distribute the estate's assets in satisfaction of allowed claims.  The confirmed plan

expressly provided for the Bankruptcy Court to have exclusive jurisdiction over all

matters arising out of and related to the chapter 11 case and the confirmed plan,

including determination of any objections to claims, determination of any and all

contested matters and adversary proceedings, and recovery of all Liquidating Trust

Assets, wherever located.

Zurich issued general liability and workers' compensation insurance policies to

Payton for two prepetition periods, January 27, 2005 through January 27, 2006, and

January 27, 2006 through January 27, 2007.  These policies insured not only Payton

but also certain of its affiliates.  In connection with each policy, Payton and Zurich

entered into agreements known as Deductible Agreements.  In order to secure Payton's

obligations to Zurich under these Deductible Agreements, Payton posted for Zurich's

benefit (i) a letter of credit in the amount of $750,000 and (ii) cash collateral in the

amount of $50,000.  Each Deductible Agreement provides for mandatory arbitration of

disputes arising thereunder: "Any dispute arising out of the interpretation, performance

or alleged breach of the Agreement, shall be settled by binding arbitration administered

by the American Arbitration Association[.]"  The Deductible Agreements further specify

that absent agreement to the contrary, the arbitration shall take place in Schaumburg,

Illinois.

　　　　Zurich also issued policies to Payton for the period from January 31, 2007 to May

1, 2007, during which Payton filed its bankruptcy petition (collectively, the "2007

Policy").  Zurich does not contend that the 2007 Policy includes an arbitration clause.

　　　　On June 6, 2008, Zurich filed an application in Payton's bankruptcy case for

allowance and payment of an administrative expense claim under the 2007 policy in the

amount of $15,029.  In the application, Zurich explained that this amount represents

unpaid premiums for  the 2007 Policy that are allocable to coverage for the postpetition

period.[1]  In the application, Zurich further stated that the "the claims set forth herein are

calculated after application of these loss funds and letters of credit."  The "loss funds"

and "letters of credit" in this statement appear to be references to the $50,000 escrow

fund and $750,000 letter of credit that Payton posted under the Deductible Agreements.

The Application does not indicate how much of the escrow funds and letter of credit

Zurich drew down to reduce the amount of its postpetition claim; nor is it clear whether

---

[1]  Zurich has also filed a nonpriority unsecured claim in this case for an unspecified
amount [Claim #310].  That claim is not part of the instant adversary proceeding.

the amounts so drawn were applied only to amounts owing under the Deductible

Agreements or also to amounts owing under the 2007 Policy.

On June 26, 2008, Payton filed, as the "complaint" in this adversary proceeding,

an objection to Zurich's administrative expense claim and a five-count counterclaim

against Zurich.[2]  After the effective date of confirmation of the liquidating plan, Craig

Jalbert, as Trust Administrator of the Liquidating Trust, moved to be substituted for

Payton as the proponent of the objection and counterclaim, and that motion has been

allowed.

 Jalbert's objection to Zurich's administrative claim and his five-count

counterclaim against Zurich are each based on two principal theories of recovery.  The

first is that Zurich's collateral (the escrow fund and letter of credit) exceeds reasonable

loss reserves, and that the collateral value in excess of reasonable loss reserves is an

asset of the bankruptcy estate and should be turned over to Jalbert as Trust

Administrator.  On this theory, Jalbert demands an accounting of Zurich's actual losses

and projected losses (Count I), a declaratory judgment as to the reasonableness of the

loss reserves established by Zurich (Count II), and turnover of such collateral as

exceeds the properly-calculated loss reserves (Count III).  In the second theory, Jalbert

contends that payments by Payton to Zurich for insurance coverage of Payton's

affiliates were fraudulent transfers under 11 U.S.C. § 548 because Payton itself, as

opposed to its affiliates, did not receive reasonably equivalent value for the payments.

---

[2]  The assertion of an objection to claim in an adversary complaint is required where the objection is joined with a counterclaim that itself would require an adversary complaint: "A party in interest shall not include a demand for relief of a kind specified in Rule 7001 in an objection to the allowance of a claim, but may include the objection in an adversary proceeding."  FED. R. BANKR. P. 3007(b).

On this theory, Jalbert demands a further accounting as to premium payments and loss

reimbursements made by Payton to Zurich on account of Payton's affiliates (Count IV)

and avoidance and recovery of those payments and reimbursements as fraudulent

transfers under § 548 of the Bankruptcy Code (Count V).  Jalbert uses these two

theories of recovery in two ways.  First, they form the basis of his defense against

Zurich's administrative claim:  Jalbert asserts these counterclaims as a setoff; in fact, he

offers no defense against Zurich's administrative claim but this defense of setoff.

Second, in the counterclaims, they are a basis for affirmative recovery.

Zurich has not yet filed an answer to the counterclaims.  Rather, it has filed the

present motion, by which it seeks (i) an order compelling arbitration of its administrative

claim and of Jalbert's counterclaims, (ii) if the court compels arbitration as to some but

not all counts in dispute, a stay pending arbitration of the counts not being arbitrated,

and (iii) if the court declines to compel arbitration of Jalbert's fraudulent transfer count,

dismissal of that count for failure to state a claim on which relief can be granted.  Jalbert

opposes the motion.


## II.    POSITIONS OF THE PARTIES

Zurich argues that the arbitration clause in the Deductible Agreements mandates

arbitration of all counts in this adversary proceeding except the fraudulent transfer

count; the court has discretion only as to the fraudulent transfer count, but this count too

should be referred to arbitration, Zurich argues, for the sake of judicial economy.  Zurich

contends that the Federal Arbitration Act ("FAA") mandates enforcement of arbitration

clauses except only where overriden by a conflicting federal statute.  Zurich argues that

federal bankruptcy law conflicts with the FAA only where the matter at issue is a core

bankruptcy proceeding within the meaning of 28 U.S.C. § 157 *and* enforcement of the arbitration agreement would inherently conflict with the purposes of the bankruptcy laws; only where both conditions are satisfied does the court have discretion not to compel arbitration.  Zurich further argues that, except for the fraudulent conveyance count, the various counts at issue here are non-core and in the nature of contract disputes, not truly in the nature of turnover actions, as Jalbert maintains.

Jalbert argues that each of the counts at issue is a core proceeding within the meaning of § 157(b):  Zurich's administrative claim is a claim against the estate, 28 U.S.C. § 157(b)(2)(B); Jalbert's counterclaims are counterclaims by the estate against a person, Zurich, filing a claim against the estate, § 157(b)(2)(C); the counterclaim for turnover of collateral in excess of valid loss reserves is a demand for turnover of property of the estate, § 157(b)(2)(E); as Zurich acknowledges, the fraudulent transfer count is plainly core under § 157(b)(2)(H); and all these counts are "proceedings affecting the liquidation of assets of the estate" within the meaning of § 157(b)(2)(O). Jalbert further argues that each of his counts implicates a fundamental purpose of the bankruptcy laws, that of creating a central forum in which all disputes concerning a debtor and its estate can be resolved expeditiously and without the expense and attendant inefficiencies of litigating in distant and diverse fora.  Jalbert further argues that by having filed a proof of claim in this case, Zurich submitted itself to the jurisdiction of this court.

## III.    DISCUSSION

### 1.  The Motion to Compel Arbitration

The matters before the court include six counts—Zurich's administrative claim and Jalbert's five counterclaims.  To simplify, these six may fairly be grouped into only three distinct matters for purposes of the present analysis:  (i) Zurich's administrative claim, including Jalbert's objection to it ("the Administrative Claim"); (ii) Jalbert's demand for turnover of the collateral in excess of reasonable loss reserves (Count III), including the related counts for an accounting and for declaratory relief (Counts I and II), which are part and parcel of the same demand (collectively, "the Turnover Demand"); and (iii) Jalbert's fraudulent transfer count (Count V), including his related demand for an accounting of the premium payments and loss reimbursements made by Payton to Zurich on account of Payton's affiliates (Count IV) (collectively, "the Fraudulent Transfer Claim").

With respect to two of these three matters, the Administrative Claim and the Turnover Demand, Zurich is asking the Court to enforce a contractual agreement to arbitrate.  With respect to the third, the Fraudulent Transfer Claim, Zurich concedes that there has been no contractual agreement to arbitrate.  Zurich asks the court to compel arbitration of this matter, too, but it cites no basis in contract or law for doing so; Zurich merely argues that if the Court compels arbitration as to the other two matters, it should send the Fraudulent Transfer Claim to arbitration, too, for the sake of judicial economy. Zurich's argument for arbitration of the Fraudulent Transfer Claim is thus dependent on the success of its argument as to the other two matters, so the court will begin with the Administrative Claim and the Turnover Demand.

The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.,* requires arbitration only of certain matters that parties have already contractually agreed to arbitrate; it presumes the existence of an agreement to arbitrate.[3]   When faced with a motion to enforce an agreement to arbitrate as to claims arising under federal statutes, such as the Bankruptcy Code, the Court must conduct a two-part inquiry, asking first whether the parties agreed that the matter at issue should be resolved by arbitration and, if so, then whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.[4]   If the first, "contractual" question is answered in the negative as to a particular matter, the Court cannot compel arbitration of that matter. However, if a matter is within the scope of the clause and the opposing party is bound by that clause, the Court must address the preclusion-of-waiver issue.

### a.  The Contractual Issues

The first inquiry is purely contractual:  did the parties agree that the matter at issue should be resolved by arbitration?  This in turn involves two subsidiary issues: is the subject matter of the claim within the scope of matters to which the arbitration clause applies?  And does the agreement of which the clause is a part bind the party against whom arbitration would be compelled?  If either question is answered in the

---

[3]   Federal Arbitration Act, 9 U.S.C. § 2.

[4]   *Green Tree Financial Corporation-Alabama v. Randolph*, 531 U.S. 79, 90, 121 S.Ct. 513, 521 (2000) ("In determining whether statutory claims may be arbitrated, we first ask whether the parties agreed to submit their claims to arbitration, and then ask whether Congress has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.").

negative as to a particular matter, the Court cannot compel arbitration.  The contractual

question is one of contract law and interpretation, but with a twist:

> The Arbitration Act establishes that, as a matter of federal
> law, any doubts concerning the scope of arbitrable issues
> should be resolved in favor of arbitration, whether the
> problem at hand is the construction of the contract language
> itself or an allegation of waiver, delay, or a like defense to
> arbitrability."  Thus, as with any other contract, the parties'
> intentions control, but those intentions are generously
> construed as to issues of arbitrability.[5]

Therefore, while applying ordinary state-law principles of contract law and interpretation

to discern the parties' intentions, the Court must, as a matter of federal law, resolve

doubts in favor of arbitrability.[6]  Nonetheless, as in any contractual matter, the party

seeking enforcement of the contract bears the burden of proving that the contract

requires what that party is asking the court to enforce—in this instance, arbitration of

two particular matters in controversy.

The arbitration clauses on which Zurich relies are two identical clauses, set forth

in the 2005 and 2006 Deductible Agreements.  Each clause requires arbitration as to

"[a]ny dispute arising out of the interpretation, performance or alleged breach of the

Agreement," meaning the Deductible Agreement of which the clause is a part.  The

clauses do not mandate arbitration of disputes under other agreements between the

same parties, such as the 2007 Policy.  Zurich does not contend that the 2007 Policy

---

[5]  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 105 S.Ct.
3346, 3353 (1985) (citations omitted).

[6]  *PaineWebber, Inc. v. Elahi*, 87 F.3d 589 (1st Cir. 1996) ("We apply general state-law
principles of contract interpretation to an arbitration agreement, but with due regard to the
federal policy favoring arbitration." (internal quotations and citations omitted)).

contains an arbitration clause.  Nor does Zurich argue that the clauses in the Deductible
Agreements apply to disputes under the 2007 Policy.

The Deductible Agreements were signed only by Zurich and Payton.  Jalbert was
not a signatory to either agreement.  Also, Payton signed both before filing its
bankruptcy petition; it did not sign them as representative of its bankruptcy estate—as
might a debtor-in-possession in chapter 11—or in a fiduciary capacity for the benefit of
its creditors.  Jalbert now brings both the Turnover Demand and his setoff defense to
the Administrative Claim by relying on Payton's prepetition rights under the Deductible
Agreements.  This Court has no evidence, however, that either Jalbert or Payton as
debtor-in-possession waived the bankruptcy estate's rights to judicial resolution of these
claims.

### (i) Turnover Demand

By the Turnover Demand, Jalbert seeks to enforce Payton's rights under the
Deductible Agreements for the benefit of the estate.  The subject matter of this demand
plainly falls within the scope of the arbitration clauses in that it "arises out of the
interpretation, performance or alleged breach of" the Deductible Agreements.  The
Trustee asserts this claim as a demand for turnover of property of the bankruptcy estate
under section 542 of the Bankruptcy Code, but his arguments concerning property
rights and his entitlement to turnover all rest at bottom on the terms of the Deductible

Agreements.[7]  The subject matter of the Turnover Demand is therefore within the scope
of the arbitration clauses.

Jalbert, although not a party to the Deductible Agreements, is nonetheless bound
by them as a matter of contract law.  Jalbert seeks to enforce rights of Payton under the
Agreements; these are not rights that inured in the first instance to him or to the estate
he now represents.  Rather, he is enforcing Payton's rights under the agreements by
stepping into Payton's shoes.  In doing so, he is subject to those contractual defenses,
both substantive and procedural, that Zurich could have asserted against Payton.  This
Court concludes that, as a matter of contract (and without yet reaching the issue of
enforceability in bankruptcy), the Turnover Demand, as asserted by Jalbert, is one to
which the arbitration clauses apply.

### (ii) Administrative Claim

Zurich's Administrative Claim, standing by itself, would not be subject to the
arbitration clauses.  The claim arises under the 2007 Policy, which contains no
arbitration clause of its own and is not within the scope of arbitration clauses in the
Deductible Agreements.  In opposition to this Administrative Claim, however, Jalbert
interposes an affirmative defense—his *only* articulated defense to the Administrative
Claim—under which he employs Payton's counterclaims under the Deductible
Agreements as a setoff.  By doing so, Jalbert transforms the Administrative Claim into a
dispute that arises out of the Deductible Agreements.  His entire defense to the

---

[7]  The Court does not mean that the Turnover Demand is not truly in the nature of
turnover action under section 542—whether it is a turnover action or a simple breach-of-contract
action is not the immediate concern—only that Jalbert's entitlement to turnover or relief of any
kind is highly dependent on disputed issues of contract.

Administrative Claim derives from his rights of recovery under the Deductible Agreements.  This Court therefore concludes that, no less than the turnover demand, and for precisely the same reasons, the Administrative Claim, as asserted against Jalbert, falls within the scope of the arbitration clauses.

### (iii) Fraudulent Transfer Count

The Fraudulent Transfer Count does not arise under the Deductible Agreements. The basis of this count is Jalbert's argument that, by virtue of the 2005 and 2006 policies and the related Deductible Agreements, Payton and Zurich effected a fraudulent transfer, in contravention of the rights of Payton's creditors.  Though it focuses on a transfer effected in part under the Deductible Agreements of which the arbitration clauses were a part, it does not arise under those agreements.  Rather, the Fraudulent Transfer Count arises under 11 U.S.C. § 548, is predicated on an injury not to Payton but to its creditors, and is being prosecuted by Jalbert on behalf of the bankruptcy estate and the creditors to whom Jalbert is obligated by the confirmed plan to distribute its assets.  It therefore is not one to which the arbitration clauses apply, and Zurich does not contend otherwise.

### b.  The Enforceability Issues

Having concluded that the arbitration clauses apply to the Turnover Demand and the Administrative Claim, the Court must proceed to determine whether they should be enforced.  In relevant part, the Federal Arbitration Act ("FAA") states:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the

> refusal to perform the whole or any part thereof . . .  shall be
> valid, irrevocable, and enforceable, save upon such grounds
> as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  By its terms, this provision renders valid and enforceable those

contractual provisions that (a) are written, (b) appear in contracts evidencing a

transaction involving commerce, and (c) provide for the settlement by arbitration of a

controversy thereafter arising out of such contract or transaction, or the refusal to

perform the whole or any part thereof.  The arbitration clauses in the Deductible

Agreements plainly satisfy these three requirements.

But enforcement of these arbitration clauses and those like them in similar

contexts would have the potential to disrupt the complex edifice of rights, procedures,

and jurisdiction established by other federal statutes—the Bankruptcy Code and related

jurisdictional statutes (and the rules issued pursuant to these)—for the handling of

bankruptcy cases and all civil proceedings arising in or relating to them.  The matters at

issue are not simple disputes between two parties to a contract.  Zurich's counterparty

in both matters is not Payton but Jalbert as representative of the bankruptcy estate.[8]

These matters arise in a bankruptcy case and, in part, under core provisions of the

Bankruptcy Code that create a bankruptcy estate, govern the adjudication and priority of

claims against the estate, and require an estate representative—whether a trustee in

bankruptcy, a debtor-in-possession, or, as in this instance, a fiduciary exercising the

rights of a bankruptcy trustee pursuant to a confirmed liquidating plan—to collect and

liquidate estate assets for the benefit of creditors.  Moreover, these matters were

---

[8]  Moreover, though Payton did initially file the objection to claim and counterclaim that Jalbert is now prosecuting, it did so as a debtor in possession in its chapter 11 case, and therefore as a fiduciary for the benefit of the bankrupt estate, not merely as Payton in its own right.

commenced in the bankruptcy court, where such matters routinely are prosecuted and

which Congress created precisely to handle matters of this kind.  The question that

remains, however, is whether the Federal Arbitration Act nonetheless requires that

these matters be handled in arbitration.

The Supreme Court has provided the beginning of an answer to that question:

> Like any statutory directive, the Arbitration Act's mandate
> may be overridden by a contrary congressional command.
> The burden is on the party opposing arbitration, however, to
> show that Congress intended to preclude a waiver of judicial
> remedies for the statutory rights at issue. . . .  If Congress
> did intend to limit or prohibit waiver of a judicial forum for a
> particular claim, such an intent will be deducible from the
> statute's text or legislative history or from an inherent conflict
> between arbitration and the statute's underlying purposes.

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226-27, 107 S.Ct. 2332,

2337-38, 96 L.Ed.2d 185 (1987) (upholding enforceability of agreements to arbitrate as

to Securities Exchange Act and RICO claims) (internal citations and quotations omitted).

*McMahon* thus recognizes that the Arbitration Act may be overriden by contrary

Congressional command in another federal statute. To that end, *McMahon* requires a

showing that Congress intended to preclude a waiver of judicial remedies for the

statutory rights at issue, and it places the burden of such proof on the party opposing

enforcement of the arbitration clause.

The parties and authorities agree that neither the text nor the legislative history of

the Bankruptcy Code and related statutes clearly expresses a Congressional intention

to preclude (or not) a waiver of judicial remedies for the statutory rights under the Code.

In such circumstances, *McMahon* provides that courts may deduce the requisite proof of

Congressional intent "from an inherent conflict between arbitration and the statute's

underlying purposes."  *McMahon*, however, did not involve claims asserted in

14

bankruptcy, and the Supreme Court has not yet determined the extent to which the

Bankruptcy Code and related jurisdictional statutes evince a Congressional intention to

preclude a waiver of judicial remedies for matters arising in bankruptcy cases.  Nor is

there binding precedent on the issue within the First Circuit.

Numerous courts have by now opined on the issue, but with diverse results.  The

leading case is *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt.*

*Corp. (In re Nat'l Gypsum)*, 118 F.3d 1056 (5th Cir.1997) ("*National Gypsum*"), whose

holding has been followed by three other courts of appeal and by three bankruptcy

courts within this circuit.[9]  The analysis commended by these cases may be

summarized as follows:  the bankruptcy court lacks discretion to refuse to compel the

arbitration of matters not involving "core" bankruptcy proceedings under 28 U.S.C. §

157(b); and even when a proceeding is core, the bankruptcy court may decline to

enforce an otherwise applicable arbitration agreement only when (a) the underlying

nature of a proceeding derives exclusively from the provisions of the Bankruptcy Code

(not from prepetition legal or equitable rights of a debtor) (the "arising-under

requirement") and (b) the arbitration of the proceeding would conflict with the purpose of

the Code (the "inherent conflict requirement").

This test has two problems.  First, the Supreme Court stated in *McMahon* that

where there exists an inherent conflict between arbitration and a statute's underlying

purposes, arbitration should not be compelled.  Under the *National Gypsum* test,

---

[9] *In re Electric  Machinery Enterprises., Inc.*, 479 F.3d 791, 796 (11th Cir. 2007); *In re Mintze*, 434 F.3d 222, 231 (3rd Cir. 2006); *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 166 (2d Cir. 2000); *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495 (5th Cir. 2002); *In re Merrill*, 343 B.R. 1, 9 (Bankr. D. Me. 2006); *In re Cavanaugh*, 271 B.R. 414, 424-426 (Bankr. D. Mass. 2001); *Sternklar v. Heritage Auction Galleries, Inc. (In re Paul)*, 2008 WL 4844768 (Bankr. D. Mass. 2008).

however, such an inherent conflict would not be enough to avert arbitration.  Arbitration

would still be required, despite this inherent conflict, if the underlying action did not arise

under the Bankruptcy Code itself, as opposed to non-bankruptcy law.  The arising-under

requirement is extraneous to the Supreme Court's own prescription and would serve to

require arbitration even where, under *McMahon*, a court discerns a Congressional intent

to preclude a waiver of judicial remedies.  The arising-under requirement is therefore

both superfluous to *McMahon* and potentially at cross-purposes with it.

This is especially true because, as explained below, Congress deliberately gave

the bankruptcy court jurisdiction over many matters related to bankruptcy cases that do

not arise under the Bankruptcy Code precisely because the widest possible jurisdiction

is often crucial to the success of a reorganization, the maximization of value for

creditors, or the protection of debtors in bankruptcy.  Even many "core"

proceedings—for example, claims against the estate, disputes over the validity and

extent of liens, disputes over exemptions claimed under non-bankruptcy law—do not

arise exclusively under the Bankruptcy Code but are routinely adjudicated in the

bankruptcy court by Congressional design.

The second difficulty in the *National Gypsum* analysis is like the first:  it removes

all discretion as to noncore matters simply because they are noncore and without

regard to whether there exists an inherent conflict between arbitration of the matter and

the underlying purposes of the bankruptcy laws.  In *National Gypsum* itself, the Fifth

Circuit Court of Appeals recognized that the core-noncore distinction in 28 U.S.C. § 157

was designed to serve a jurisdictional purpose and not to determine whether there

exists an inherent conflict between arbitration of a matter and the bankruptcy laws'

underlying purposes.  *National Gypsum*, 118 F.3d at 1067.  For that reason, the Fifth

Circuit rejected a position that would categorically have deemed arbitration of core

bankruptcy proceedings inherently irreconcilable with the Bankruptcy Code.  For the

same reason, noncore matters should not, *a priori*, be channeled into arbitration without

benefit of an inherent-conflict analysis: the core or noncore status of a particular

proceeding is not a dispositive indicator of whether arbitration of the matter would

conflict with a purpose of the Bankruptcy Code.

A bankruptcy case is a centralized and collective proceeding for which a special

court and special rules were created.  These exist to facilitate the expeditious and

relatively inexpensive resolution of all matters relating to a particular bankruptcy case,

so as to make reorganization possible, enhance a debtor's fresh start, and, where

applicable, maximize value and expedite recovery for creditors.  In view of the unique

and collective nature of bankruptcy cases, of the creation of this special forum for

adjudication of matters in bankruptcy, and of the establishment of an elaborate body of

rules for adjudication of bankruptcy-related proceedings in the Bankruptcy Court, there

arises a presumption that Congress intended for the Bankruptcy Court to be the

principal and usual, if not exclusive, forum for most matters in bankruptcy, and that it

should be available to debtors, creditors, and the estate representatives for bankruptcy

purposes.  Some matters can go elsewhere, and not every proceeding filed in

Bankruptcy Court belongs there; the bankruptcy jurisdictional statutes do permit a court

to abstain in certain circumstances.  See 28 U.S.C. § 1334(c).  But these exceptions

mostly serve to prove the general rule.

Both the Administrative Claim and the Turnover Demand are core proceedings.

The Administrative Claim, as a claim against the bankruptcy estate, is defined as a core

proceeding by 28 U.S.C. § 157(b)(2)(B) (core proceedings include "allowance of

17

disallowance of claims against the estate").  The Turnover Demand is also a core

proceeding in several respects:  it is a counterclaim by the estate against an entity that

has filed a claim against the estate, § 157(b)(2)(C) (core proceedings include

"counterclaims by the estate against persons filing claims against the estate"); a

proceeding to determine the validity or extent of Zurich's interest in Payton's collateral, §

157(b)(2)(K) (core proceedings include "determinations of the validity, extent, or priority

of liens"); a demand for a turnover order, § 157(b)(2)(E) (core proceedings include

"orders to turnover property of the estate"); and a proceeding to liquidate assets of the

estate, Payton's claims against Zurich under the Deductible Agreements, § 157(b)(2)(O)

(core proceedings include "other proceedings affecting the liquidation of assets of the

estate").  In all material respects, these are ordinary, everyday bankruptcy matters, well

within the scope of matters that Congress intended that bankruptcy courts would

handle.

For the adjudication of bankruptcy rights and oversight of bankruptcy cases,

Congress created bankruptcy courts and, through the District Courts, gave to them

original and exclusive jurisdiction over bankruptcy cases (28 U.S.C. §§ 1334(a) and

157(a)).  With respect to matters concerning the liquidation of the estate and the

adjudication of claims against it, it is significant that Congress also gave to the

bankruptcy court (again, through the federal district court) exclusive jurisdiction over all

property of the debtor as of the commencement of the case and of the bankruptcy

estate (28 U.S.C. §§ 1334(e)(1) and 157(a)).

The bankruptcy estate is itself a creature of the bankruptcy laws, 11 U.S.C. §

541(a).  It comes into existence only at the commencement of the bankruptcy case and

constitutes a separate entity from the debtor.  The trustee in bankruptcy serves as the

representative of the estate.  11 U.S.C. § 323(a).  Even in those chapter 11 cases in

which the debtor remains a debtor-in-possession and there is no trustee, the debtor-in-

possession represents the estate in a fiduciary capacity, exercising, as to the estate, the

rights, powers, and certain duties of a trustee.  11 U.S.C. § 1107(a).  In this case, the

confirmed plan transferred the assets of the estate to the Liquidating Trust, and it gave

to Jalbert, as Trust Administrator, the powers of a trustee in bankruptcy, to be exercised

for the benefit of creditors.

Jalbert has not waived his or the Liquidation Trust's right to a judicial

determination of the matters at issue here; nor, during this bankruptcy case, did Payton,

as debtor-in-possession, execute such a waiver.  The Bankruptcy Code contains no

such waiver of rights.  Nor, in view of Congress' grant of exclusive jurisdiction over

property of the estate to the bankruptcy court, is any such waiver implicit in the

bankruptcy laws.

The enforcement of the arbitration agreement as to the present matters would

force Jalbert to litigate these matters in a distant forum and under unfamiliar rules, at

appreciable expense to the estate and with considerable delay.  If arbitration clauses

were regularly enforced as to such routine bankruptcy matters, these clauses would

soon multiply in ordinary consumer credit agreements, and trustees and debtors would

consequently be forced to adjudicate routine bankruptcy matters in diverse fora in every

case, with (for example) each objection to claim being arbitrated in a different forum.

This in turn would undermine a system that was designed precisely to avoid such

dissipation of the parties' energies and the estate's resources.

The Court summarizes the above considerations as follows.  The matters at

issue concern the bankruptcy estate, including both a claim against it and a

counterclaim to recover and liquidate certain of its assets.  Congress, through the

District Court, gave to the Bankruptcy Court both exclusive jurisdiction over the estate

and wide jurisdiction over matters related to the bankruptcy case to facilitate the

expeditious and inexpensive liquidation of estate assets and adjudication of claims

against the estate.  Considerations of expedience are as real and pertinent in this case

as they usually are in bankruptcy liquidations.  And Jalbert, the estate, and the

creditors—the real parties in interest here—have not waived *their* right to a judicial

determination of these matters.  In view of these considerations, the Court finds that

there would be an inherent conflict between arbitration and the bankruptcy laws'

underlying purposes with respect to the matters at issue, and that Congress intended to

preclude a waiver of judicial remedies for such matters.  The motion to compel

arbitration will therefore be DENIED.

## 2.  The Motion to Dismiss

Zurich also moves to dismiss Count V, the Fraudulent Transfer Claim, for failure

to state a claim on which relief can be granted.  Zurich argues that this count merely

parrots the language of 11 U.S.C. § 548(a)(1)(B), under which the claim is asserted,

and is so lacking in specifics—notably, the dates and amounts of the transfers in

question—that it falls far short of the particularity standard in FED. R. CIV. P. 9(b) for

claims of fraud, even allowing for the relatively relaxed requirement for constructive

fraud.[10]  Jalbert opposes this motion, arguing that (i) that the heightened pleading

standard does not apply to this count, both because the count is being asserted by a

---

[10]  Jalbert is challenging the transfers only as *constructively* fraudulent; he makes no
allegation of actual intent to hinder, delay, or defraud.

third-party trustee and because this count alleges only constructive, not actual, fraud, (ii)

this count does not fail to state a claim on which relief can be granted, and (iii) even if

the allegations are insufficiently particular, the appropriate remedy is not to dismiss but

to require amendment.

The Court agrees with Jalbert that this count does not fail to state a claim on

which relief can be granted:  it alleges the necessary elements for avoidance of a

transfer under  § 548(a)(1)(B), and Zurich does not contend otherwise.  Moreover, it

identifies the transfers in question with sufficient specificity at least to overcome a Rule

12(b)(6) challenge.  These are identified variously as payments made by Payton to

Zurich "on or within two years before the Petition Date on account of insurance

coverage attributable to the Affiliates" (Count V at ¶ 30), "all premiums and loss

payments made by the Debtor on account of insurance coverage attributable to the

affiliates" ("Wherefore" ¶ 4), and "any premium, deductible, or loss payment

. . . made by the Debtor [Payton] to Zurich within two years of the Petition Date on

account of insurance coverage attributable to the Affiliates" ("Wherefore" ¶ 5).  While

Count V does not identify specific payments by amount, date, and manner effected, it

does give a time frame and specify the nature of the transfers that Jalbert is seeking to

avoid.  The Court is confident that  the descriptions thus provided will permit the parties,

as they proceed with discovery, to distinguish the transactions at issue from those that

are not.  Jalbert cannot at this stage be required to do more.  He is an outsider to these

transactions and will need discovery to identify the specific transactions by date,

amount, and the manner in which they were effected.  Accordingly, the motion to

dismiss Count V will be DENIED.

**IV.    CONCLUSION**

For the reasons set forth above, the Motion of Zurich American Insurance

Company to Stay or Dismiss Adversary Proceeding and Compel Arbitration will be

DENIED.

An Order in conformance with this Memorandum of Decision shall issue in

conjunction herewith.


Date: January 13, 2009                    /s/ Henry J. Boroff_____
                                          Henry J. Boroff
                                          United States Bankruptcy Judge